| | |
|---|---|
| District Court, Mesa County, Colorado<br>125 N Spruce St.<br>Grand Junction, CO 81501<br><br>Plaintiffs: Joshua Thompson<br><br>v.<br><br>Defendants: Amazon.com, Inc., Amazon.com Services LLC, Amazon Logistics, Inc., and IQ Logistics LLC | DATE FILED<br>January 28, 2025 11:34 AM<br>FILING ID: 56989DB332933<br>CASE NUMBER: 2025CV30046<br><br><br><br>▲   COURT USE ONLY   ▲ |
| J. Keith Killian, Esq.                              No. 9042<br>Benjamin B. Hoyer                             No. 60677<br>Killian, Davis, Richter & Fredenburg, PC<br>202 North Seventh Street<br>Post Office Box 4859<br>Grand Junction, Colorado 81502<br>Telephone: (970) 241-0707<br>Attys. for Plaintiff: Joshua Thompson | **Case Number:**<br><br><br><br>Division |
| **COMPLAINT** ||

The Plaintiff, through his attorneys, Killian Davis Richter & Fredenburg PC, files this complaint and in support thereof states the following:

## INTRODUCTION

1. Plaintiff Joshua Thompson ("Thompson") sustained life-threatening injuries from a semi-truck collision on December 8, 2023. The semi-truck, driven by Hamza Alodat and owned by Lion Brothers Trucking, was transporting a load for Amazon.com, Inc., Amazon.com Services LLC, Amazon Logistics, Inc., and IQ Logistics.

2. The plaintiff alleges that the defendants were negligent in selecting the Lion Brothers Trucking as the motor carrier to transport their freight. On December 8, 2023, Lion Brothers Trucking was a documented danger to the motoring public specifically regarding hours-of-service violations. Nonetheless, the defendants hired Lion Brothers Trucking and entrusted them with a load in order to satisfy their perceived delivery representations.

3. On December 8, 2023, predictably, Hamza Alodat fell asleep while transporting the defendant's freight, crossed onto the wrong side of the I-70 interstate, and collided head on into the vehicle being driven by plaintiff Thompson. As a result, plaintiff submits the allegations set forth below.

1

**EXHIBIT A**

## PARTIES

4. Defendant Amazon.com, Inc. is a foreign for-profit corporation doing business in Colorado. Its principal place of business is 410 Terry Avenue North, Seattle WA, 98109. Its agent for service of process in Colorado is:

5. Defendant Amazon.com Services LLC, is a foreign limited liability company doing business in Colorado. Its principal place of business is 410 Terry Avenue North, Seattle WA, 98109. Its agent for service of process in Colorado is: Corporation Service Company, 1900 West Littleton Boulevard, Littleton, CO 80120.

6. Defendant Amazon Logistics, Inc. is a foreign for-profit corporation doing business in Colorado. Its principal place of business is 410 Terry Avenue North, Seattle WA, 98109. Its agent for service of process in Colorado is: Corporation Service Company, 1900 West Littleton Boulevard, Littleton, CO 80120.

7. Defendant Amazon Logistics is a motor carrier registered with the Department of Transportation (DOT) with a DOT carrier/broker license number of 2881058.

8. Collectively, Amazon.com, Inc., Amazon.com Services LLC, and Amazon Logistics, Inc. will be referred to as the Amazon defendants.

9. IQ Logistics LLC (IQ Logistics) is a Texas limited Liability Company doing business in Colorado with its principle place of business at 4050 Telephone Rd., Dallas, TX, 75241. Its agent for service of process in Colorado is: LegalCorp Solutions, LLC, 501 South Cherry Street, 11th Floor, Denver, CO 80246.

10. IQ Logistics is a motor carrier registered with the DOT with a DOT carrier/broker license number of 3172438.

## JURISDICTION AND VENUE

11. Defendants Amazon,com, Inc., Amazon.com Services, LLC, Amazon Logistics, Inc. and IQ Logistics conduct substantial business in Colorado.

12. On or about December 8, 2023, the defendants were engaged in transportation of goods through Colorado.

13. This Court has jurisdiction over this action pursuant to § 13-1-124(I)(a)(b), C.R.S. because defendants transacted business in Colorado, and the tortious acts were committed in Colorado.

14. Venue is proper in this Court pursuant to C.R.C.P. 98(c)(1) because defendants are non-residents of the state of Colorado. The plaintiff resides in Mesa County and therefore, the action may be tried in the county designated in the complaint.

**EXHIBIT A**

## GENERAL ALLEGATIONS

15. Plaintiffs adopt and incorporate by reference the allegations of the previous paragraphs as if fully set forth herein.

### Amazon's Delivery System

16. Amazon.com, Inc. with its subsidiaries, is the world's largest online retailer. Amazon.com, Inc. acquired this status largely because of its representations and promises of prompt delivery—sometimes even within hours.

17. In order to keep their promises for prompt delivery, the Amazon defendants have collectively developed an extensive transit network across the State of Colorado comprised of three stages: "the first mile," "a middle mile," "and the last mile."

18. The first mile is where a customer's item is selected from a warehouse and placed in a box for shipment. The middle mile consists of loading those boxes onto trucks headed to similar destinations. The last mile consists of loading specific items onto vans to be delivered to the local customer.

19. The middle mile stage of the Amazon defendant's business model relies upon thousands of interstate and intrastate motor carriers to position the goods in the numerous distribution centers for rapid delivery.

20. Defendant, Amazon.com Services, LLC, is the product and goods part of the Amazon operation and relies on the advertising of prompt and immediate delivery of products ordered by customers. To meet their deadlines, Amazon.com Services, LLC has an extensive network of distribution warehouses and storage facilities across the State of Colorado.

21. Defendant, Amazon Logistics, Inc., is the transportation and logistics subsidiary of Amazon.com, Inc. Amazon Logistics contracts with thousands of interstate and intrastate motor carrier trucking companies and brokers to position Amazon goods efficiently and fulfill their delivery promises.

22. Together, the Amazon defendants are engaged in a joint venture for the promotion, sale, and delivery of products sold on Amazon.com.

### Amazon's Control of the Middle Mile

23. At all relevant times, Amazon defendants used various programs to ensure their packages are delivered promptly.

24. To ensure that the hired motor carriers are making the deadlines the Amazon defendants have promised their customers, the Amazon defendants exert stringent and detailed control over all motor carriers in their hire.

25. At all times, the Amazon defendants were in control of the shipment of their freight.

**EXHIBIT A**

26. Once a company has obtained interstate operating authority, it can become part of Amazon's network by simply applying to "partner with Amazon" to haul loads of freight under Amazon's Relay program. In this case, the Amazon defendants chose a company despite the company having no safety rating and without any confirmation that the motor carrier had the required safety management controls in place to ensure compliance with the appliable FMCSRs. These FMCSRs are in place to ensure the safe movement of products through the transportation system and to reduce the risk of highway incidents resulting in fatalities, injuries, and property damage.

27. The Amazon defendants did not conduct a safety investigation of the chosen motor carrier or truck driver beyond verifying the current operating authority, proof of insurance, and that the motor carrier does not have a safety rating of "unsatisfactory."

28. The Amazon defendants exert control over the details of the work done by motor carriers and drivers using a variety of tools, including internal compliance teams and a third-party compliance monitoring service, to continually monitor motor carrier compliance with their policies and to make sure the companies deliver Amazon goods on time.

29. A motor carrier that partners with Amazon is required to use Amazon Relay, which is a suite of technology products that enable carriers to self-register with Amazon and find, book, and execute Amazon loads.

30. Amazon requires all motor carriers and their drivers to use the Amazon Relay technology products in order to deliver Amazon loads.

31. Motor carriers use Amazon Relay to accept loads, assign drivers, access Amazon's Relay Load Board, track performance, view and download payment details, and report concerns, among other things.

32. Through the Load Board in Amazon Relay, drivers and carriers can search for assignments in their area and book them.

33. Motor carriers access Amazon Relay through a web browser that enables them to access a Driver Roster and to view Amazon's grading of each driver's performance, in addition to the carrier's performance overall.

34. The assignments on the Load Board are preset by Amazon to include details such as the departure time and location for the trip, arrival, and departure time for each stop along the way, and the required arrival time at the final destination.

35. Some loads involve connecting the motor carrier's semi-truck to a preloaded trailer and hauling the trailer to its destination in what is known as a "drop-and-hook" operation; others require the motor carrier or driver to supply the trailer.

36. Motor carriers working for Amazon do not negotiate payment; Amazon predetermines the payment amount into the Load Board for each assignment.

**EXHIBIT A**

37. Once a motor carrier books an assignment, the carrier must then assign a driver through Amazon Relay, and the assignment appears on the driver's Amazon Relay phone app.

38. Once the truck driver is assigned to the Load in the Amazon Relay phone app, the Amazon defendants no longer communicate with the motor carrier and all communications are directly with the truck driver.

39. Through Amazon's mobile-based Relay app for iOS and Android devices, drivers can view and manage load status, report delays, and use commercial navigation.

40. When a motor carrier or driver books a shipment through Amazon Relay, the Load Board generates a map for navigation by the driver, dictating the exact route the driver is to follow and identifying each stop with numbers on the map and delivery times.

41. Drivers use the Amazon Relay app to report delays and to update their estimated time of arrival.

42. The Amazon defendants therefore do know the identity of the actual drivers transporting their freight and can and do control and monitor those drivers and the location of their loads through the Amazon Relay app.

43. Although drivers are permitted to arrive early at their destinations, the driver or the motor carrier will receive a negative report or be discontinued and thereby is punished for arriving late.

44. At all times pertinent, the Amazon defendants monitored the performance of motor carriers and drivers using three metrics:

   a. the rate of on-time deliveries;
   b. tender acceptance (not canceling after booking a load); and,
   c. usage of the Amazon Relay app.

45. Carriers who meet Amazon's performance goals are rewarded with early access to certain assignments posted on the Load Board before the assignments become available to other Amazon partner motor carriers.

46. Driver and motor carrier safety are not considered in Amazon's performance metrics.

47. "Invoices" are automatically generated by the Amazon Relay app, with the pay week running from Sunday to Saturday and drivers/carriers typically getting money deposited in their bank accounts the following Friday.

48. While drivers and carriers are penalized for canceling a trip, Amazon may cancel or reschedule a load without notice at any time before the trip begins.

5

**EXHIBIT A**

### The FMCSAs BASIC Safety Categories

49. The FMCSA uses seven (7) Behavior Analysis and Safety Improvement Categories—BASICS—to determine a motor carrier's safety performance and compliance relative to other carriers.[1]

50. Five (5) of the seven BASICs are publicly available online through the FMCSRs safety measurement system (SMS).

51. The five publicly available BASIC categories are the following:

   a. Unsafe driving;
   b. Hours of service compliance;
   c. Vehicle maintenance;
   d. Controlled substance/alcohol; and,
   e. Driver fitness.

52. A motor carrier's BASIC scores organize data from roadside inspections, violations, crash reports, and investigation results from the prior two years.

53. A motor carrier's Basic score is a percentile representing the number of other motor carriers who were equally or more compliant in the given category. Thus, a higher score indicates hazardous practices while a lower number indicates safe practices.

54. For example, a motor carrier with a BASIC score of 78% has more violations in than category than 77% of active motor carriers.

55. On top of the publicly available SMS system, motor carriers and brokers also have access to the FMCSAs pre-employment screening program (PSP). These programs, the BASIC categories and the SMS, empower shippers, motor carriers, and brokers to ensure they are hiring safe motor carriers to transport their loads.

### Amazon Hires IQ Logistics and Lion Brother's Trucking

56. On or about December 8, 2023, the Amazon defendants contracted with defendant IQ Logistics to find a motor carrier to transport a load of packages through Colorado.

57. Amazon's retention of IQ logistics, in December 2023, fell during a "record breaking" Holliday season for the Amazon defendants.[2] Amazon's revenues for the fourth quarter of 2023 rose 14% year-over-year from 2022.

---

[1] *See* https://csa.fmcsa.dot.gov/Documents/CSA_GRS_Visor_S.pdf.
[2] https://www.emarketer.com/content/amazon-ended-2023-on-high-after-record-breaking-holiday-season

**EXHIBIT A**

58. The higher sales volume meant more promises for prompt delivery than ever. This meant that Amazon's retention of motor carriers to transport their loads was more strained than ever.

59. To satisfy Amazon's demand, the Amazon defendants hired IQ Logistics, who located Lion Brothers Trucking. To meet their shipping deadlines, the Amazon defendants' contracted with Lion Brother's Trucking to transport a load through Colorado.

60. In October of 2023, Lion Brothers Trucking had an alert on the BASIC safety information sheet kept with the FMCSA. Lion Brothers Trucking was in the 71% of motor carriers with hours-of-service violations, the 59% for unsafe driving violations, and the 55% for vehicle maintenance violations.

61. By November of 2023, Lion Brothers Trucking's safety ratings deteriorated: Lion Brothers Trucking was in the 59% for unsafe driving, the 97% for hours-of-service violations, the 31% for controlled substance violations, and the 69% for vehicle maintenance violations.

62. This meant that, at the time the Amazon defendants and IQ Logistics hired Lion Brother's Trucking, Lion Brothers Trucking had all the indicators of being an unsafe motor carrier, particularly regarding hours-of-service violations. Even a cursory review of the previous 30 days would have revealed that Lion Brothers Trucking was a hazardous motor carrier.

63. Defendant IQ Logistics and the Amazon defendants either failed to conduct even a cursory safety review of Lion Brothers Trucking Inc. or knew that Lion Brothers Trucking was a safety hazard, particularly regarding hours-of-service violations, and hired them anyway.

64. On or about December 8, 2023, the Amazon defendants entrusted their load to Lion Brothers Trucking.

### A Near-Fatal Violation of the Hours-Of-Service Requirements

65. On December 8, 2023, Lion Brothers Trucking owned a truck being driven by Hamza Alodat.

66. The semi-truck was a Kenworth Construct T680 with a vehicle identification number of 1XKYD49X9JJ215424.

67. When unloaded the semi-truck has a listed weight of 52,350 lbs. It was thus a Commercial Motor Vehicle under the FMCSRs.

68. At the time of the collision, the semi-truck was hauling a trailer owned by the Amazon defendants with a vehicle identification number of 3H3V532C0KR686045. The weight of the trailer is unknown at this time.

69. At the time of the collision, the relevant trailer being pulled was loaded with freight being shipped by Amazon.

**EXHIBIT A**

70. On December 8, 2023, Hamza Alodat was driving in violation of the FMCSR's Hours-of-Service requirements.

71. On December 8, 2023, Hamza Alodat was not keeping track of his hours on his DOT log book.

72. On December 8, 2023, Hamza Alodat was over worked and had driven in excess of the allowable hours. As such, despite being in control of a semi-truck pulling a full load, Hamza Alodat was tired, drowsy, and not alert.

73. On December 8, 2023, Hamza Alodat fell asleep while driving his semi-truck. The truck crossed the median barrier from the Interstate-70 Westbound lanes, across two eastbound Interstate 70 lanes, and collided head-on with another motorist.

74. The motorist was plaintiff Joshua Thompson.

75. Thompson's vehicle had an unloaded listed weight of 2,892 lbs.



76. This means that Hamza Alodat's unloaded truck was 18 times heavier than Thompson's Jetta.

77. The collision crumpled Thompson's vehicle.

78. The collision was so forceful, it crushed the engine and ripped the front body and mechanics from the front of Thompson's car.

79. The front end of the crushed car pinned Thompson in the driver's seat.

8

**EXHIBIT A**

80. Once stopped, Thompson screamed out in pain, stating that he could not feel his legs.

81. Thompson thought he was going to die.

82. Emergency personnel and police arrived on scene at approximately 10:00 am about four minutes after the collision.

83. After about one-half hour agony, emergency personnel attempted to extricate Thompson from his vehicle.

84. Firefighters used a hydraulic rescue tool, known as the jaws of life, to remove Thompson from his vehicle.

85. The Glenwood Springs Fire Department took over 10 minutes to extract Thompson from the vehicle using the jaws of life.

86. Thompson was taken to the hospital with life-threatening injuries.

87. Ultimately, it was discovered that Thompson suffered a closed head injury including a concussion with a loss of consciousness, femoral deformity, a right femur fracture, acute comminuted midshaft femur fracture with overriding fragment and displacement, a right pulmonary contusion, a sternal fracture, and a cardiac contusion among other injuries.

88. Police interviewed witnesses and the driver, Hamza Alodat.

89. Hamza Alodat is an Arabic speaker and speaks English as a second language.

90. Upon information and belief, Hamza Alodat sounded impaired and was groggy when speaking with police.

91. Hamza Alodat told Police that he had driven to Glenwood Springs, Colorado from Hays, Kansas and that he had been driving for over 8 hours.

92. Upon information and belief, Hamza Alodat drove westbound from Hays, Kansas to Glenwood Springs, Colorado on Interstate 70, much of which was during the snowstorm.

93. Vail, CO reported 6 inches of snow from midnight of December 7, 2023 until 8 a.m. on December 8, 2023.

94. Hamza Alodat would have driven through Vail, Colorado at around 8:00 am.

95. During his interview with police, Hamza Alodat, admitted to the police that he fell asleep while driving, which caused the collision.

**EXHIBIT A**

**Lifechanging Damages**

96. Since the collision, Thompson underwent surgery to repair his femur and was hospitalized for several days.

97. Thompson struggled for months to do simple tasks of daily living, like taking a shower, using the toilet, putting on his clothes and getting out of bed.

98. Thompson reports symptoms consistent with a traumatic brain injury, including memory loss, frustration, increased anxiety, and mood swings.

99. Thompson has not been able to find work that he is capable of performing since this incident.

100. Recovering from this collision has been the greatest difficulty Thompson has faced in his life.

101. Due to the injuries to his head, right leg and right knee, Thompson has a significant loss of access to the labor market and to this earning capacity.

102. Thompson has permanent mental and physical impairment and has suffered physical disfigurement.

**FIRST CLAIM OF RELIEF**
**AGAINST ALL DEFENDANTS**
**NEGLIGENCE**
**CJI-Civ. 9:1**

103. Plaintiff incorporates by reference all previous allegations.

104. At all material times, the defendants had a duty to hire, train, retain, and entrust competently and safely.

105. At all times material hereto, defendants had a legal duty to adhere to trucking industry standards.

106. At all times material hereto, defendants had a duty to act in compliance with rules and regulations for a commercial motor vehicle under the FMCSR's.

107. At all times material hereto, defendants had a duty to exercise reasonable care in employing motor carriers to operate semi-trucks in their employ on December 8, 2023.

108. As part of their duty to ensure that semi-trucks were operated safely while in their employ, defendants had a duty to develop and implement safety screening procedures for the motor carriers they hired.

**EXHIBIT A**

109. Defendants negligently employed a dangerous motor carrier, namely, Lion Brothers Trucking.

110. Defendants' breached their duties of care to the plaintiff, and their conduct was the proximate cause of the collision.

111. As a result of defendants' conduct as alleged above, plaintiff sustained injury, damage, and losses as set forth more fully here and below.

112. Defendants' violation of statutes, ordinance, and regulations which were designed to protect persons such as plaintiff constitutes negligence.

## SECOND CLAIM OF RELIEF
## CIVIL CONSPIRACY BY SOME OR ALL DEFENDANTS TO COMMIT A TORT
## § 13-21-111.5(4), C.R.S.
## CJI-Civ. 9:29; *Resolution Trust Corp. v. Heiserman*, 898 P.2d 1049 (Colo. 1995)

113. Plaintiff incorporates by this reference each paragraph of this complaint.

114. Joint and several liability may be imposed when a tortious act is based on negligence or the breach of a fiduciary duty of due care.

115. Joint and several liability may be imposed based on evidence of a course of conduct for which a tacit agreement to act in concert can be implied.

116. Two or more defendants or others came to a meeting of the minds concerning the ownership of the Kenworth one or more overt unlawful acts or civil wrongs and/or acts of negligence were performed with damages as the proximate result thereof.

117. Two or more defendants made a conscious and deliberate decision to pursue a common plan or design to commit a tortious act.

118. Two or more defendants made a conscious and deliberate decision to conduct an inherently dangerous activity together and/or other negligent acts or omissions.

119. Because two or more of the defendants made a conscious and deliberate decision to pursue a common plan or design to commit a tortious act, they are jointly liable under section 13-21-111.5(4), C.R.S.

## THIRD CLAIM OF RELIEF
## AGAINST IQ LOGISTICS AND AMAZON DEFENDANTS
## NEGLIGENT QUALIFICATION OF A MOTOR CARRIER
## *Connes v. Molalla Transport System , Inc.*, 831 P. 2d 1316 (Colo. 1992)

**EXHIBIT A**

120. Defendant IQ Logistics had a duty to develop and execute a system to ensure that all motor carriers they retained, employed, or hired were compliant with the FMCSRs.

121. Defendant Amazon had a duty to develop and execute a system to ensure that all motor carriers they retained, employed, or hired were compliant with the FMCSRs.

122. Defendant IQ Logistics had a duty to create and employ policies and procedures consistent with the USDOT regulations governing driving and operational safety of motor vehicles including drivers hours of service and vehicle inspection, repair and maintenance.

123. Defendant Amazon had a duty to create and employ policies and procedures consistent with the USDOT regulations governing driving and operational safety of motor vehicles including driver's hours of service and vehicle inspection, repair and maintenance.

124. Defendant IQ Logistics breached its duty to develop and execute a system to ensure that all motor carriers they retained, employed, or hired were compliant with the FMCSRs.

125. Defendant Amazon breached its duty to develop and execute a system to ensure that all motor carriers they retained, employed, or hired were compliant with the FMCSRs.

126. Defendant IQ Logistics breached its duty to create and employ policies and procedures consistent with the USDOT regulations governing driving and operational safety of motor vehicles including drivers hours of service and vehicle inspection, repair and maintenance.

127. Defendant Amazon breached its duty to create and employ policies and procedures consistent with the USDOT regulations governing driving and operational safety of motor vehicles including driver's hours of service and vehicle inspection, repair and maintenance.

128. Defendant IQ Logistics' breach of its duty to the plaintiff, caused the plaintiff to incur injuries, damages and losses.

129. Defendant Amazon's breach of its duty to the plaintiff, caused the plaintiff to incur injuries, damages and losses.

**FOURTH CLAIM OF RELIEF
AGAINST IQ LOGISTICS AND AMAZON
NEGLIGENT HIRING OF A MOTOR CARRIER
*Connes v. Molalla Transport System, Inc.*, 831 P. 2d 1316 (Colo. 1992)
*Hayward v. C.H. Robinson Co.*, 2014 IL App (3d) 130530, ¶ 35.**

130. On or about December 1, 2023, IQ Logistics and the Amazon defendants employed Lion Brother's trucking and All State Bros to haul a load.

12

**EXHIBIT A**

131. IQ Logistics and the Amazon defendants knew or should have known that the Lion Brothers Trucking Inc. and All State Bros would create an unreasonable risk of harm to third parties in completing the contracted work.

132. At the time of hire, IQ Logistics and the Amazon defendants did not perform a cursory safety review of Lion Brothers Trucking nor All State Bros.

133. Because they did not perform a cursory safety review, the Amazon defendants hired a hazardous motor carrier with multiple safety alerts on their profile with the FMCSA.

134. In the alternative, the Amazon defendants and IQ Logistics knew that Lion Brothers Trucking had a alarming safety rating with the FMCSA and hired them anyways.

135. That danger causes a plaintiff's damages.

## FIFTH CLAIM OF RELIEF
## VICARIOUS LIABILITY OF AMAZON DEFENDANTS TO DEFNDANT IQ LOGISTICS, ALODAT, ALL STATE BROS, AND LION BROTHERS TRUCKING UNDER THE DOCTRINE OF *RESPONDENT SUPERIOR*
## CJI-Civ. 8:23

136. Plaintiff incorporates all previous allegations as though fully set forth herein.

137. Upon information and belief, at or about the date and time of the Collision, Alodat, All States Bros., Lion Brothers Trucking, defendant IQ Logistics, and Ahmad (the hired defendants) were employed by the Amazon defendants.

138. At the time of the collision, Alodat, Ahmad, All State Bros., and Lion Brothers Trucking were under the control of the Amazon defendants.

139. At the time of the collision, the hired defendants were statutory employees of the Amazon defendants.

140. Upon information and belief, at or about the date and time of the Collision defendant Alodat, All States Bros., Lion Brothers Trucking, and Ahmad were acting within the scope and course of their employment with the Amazon defendants.

141. At or about the date and time of the Collision, the acts and/or omission of defendants Alodat, All States Bros., Lion Brothers Trucking, and Ahmad, including, but not limited to, the acts and/or omissions detailed in this Complaint, including claims of negligence and negligence *per se*, are by law deemed the acts and/or omissions of the Amazon defendants.

**EXHIBIT A**

## DAMAGES
## CJI-Civ. 6:1 and 6:1A

142. Thompson suffered injuries, damages, and losses in the December 8, 2023, collision.

143. Defendants' negligence caused Thompson to incur past and future economic injuries, damages, and losses, which includes property loss; loss of home services; loss of earnings; impairment of earning capacity in the present and future; loss of access to employment; reasonable and necessary medical expenses including but not limited to: physician, hospital, physical therapy, prescription, and other expenses.

144. Defendants' negligence caused Thompson to incur past and future non-economic injuries, damages and losses, including pain and suffering, inconvenience, emotional stress, and impairment of the quality of life.

145. Defendants' negligence caused Thompson to suffer permanent physical impairment and/or disfigurement.

WHEREFORE, plaintiff requests:

A. Judgment be entered against defendant for a monetary sum, in an amount to be proven at trial;

B. Pre-judgment and post-judgment interest;

C. Costs of litigation, including expert witness fees; and

D. Such other and further relief as the court deems just and proper.

## PLAINTIFFS' JURY DEMAND

The plaintiff hereby requests trial to a jury on all issues and pays the jury fee along with the filing fee.

DATED this 28th day of January 2025.

Killian, Davis, Richter & Fredenburg, PC

Plaintiff's Address:  　　　　　　　　　　  */s/ J. Keith Killian*
598 Grand Avenue  　　　　　　　　　　　  J. Keith Killian　　　　No. 9042
Grand Junction, CO 81504  　　　　　　　　 Benjamin B. Hoyer　　　No. 60677
　　　　　　　　　　　　　　　　　　　　  Attorneys for Plaintiffs

14

**EXHIBIT A**